# Less Guilty by Reason of Adolescence

## *Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*

Laurence Steinberg *Temple University*
Elizabeth S. Scott *University of Virginia School of Law*

*The authors use a developmental perspective to examine questions about the criminal culpability of juveniles and the juvenile death penalty. Under principles of criminal law, culpability is mitigated when the actor's decision-making capacity is diminished, when the criminal act was coerced, or when the act was out of character. The authors argue that juveniles should not be held to the same standards of criminal responsibility as adults, because adolescents' decision-making capacity is diminished, they are less able to resist coercive influence, and their character is still undergoing change. The uniqueness of immaturity as a mitigating condition argues for a commitment to a legal environment under which most youths are dealt with in a separate justice system and none are eligible for capital punishment.*

Since 1990, only a handful of countries in the world—Congo, Iran, Yemen, Saudi Arabia, Pakistan, Nigeria, and the United States—have executed individuals whose crimes were committed when they were juveniles (Bradley, 2002; de la Vega, 2002). Twenty-one states in the United States allow the execution of individuals under the age of 18, and in most of these states, adolescent offenders as young as 16 can be sentenced to death (Streib, 2002). The United States Supreme Court has held that the death penalty is unconstitutional for youths who are under 16 at the time of their offense (*Thompson v. Oklahoma*, 1998) but has declined to categorically prohibit capital punishment for 16- and 17-year-olds (*Stanford v. Kentucky*, 1989).

Several events have occurred recently that, considered together, suggest that it is time to reexamine the constitutionality of the juvenile death penalty. First, in *Atkins v. Virginia* (2002), the Supreme Court ruled that the execution of mentally retarded offenders violates the U.S. Constitution; some of the reasons offered by the Court for the ban may also apply to the capital punishment of juveniles. Second, following the *Atkins* decision, three Supreme Court justices took the unusual step of urging reconsideration of the constitutional status of the juvenile death penalty, suggesting considerable dissatisfaction at the highest level with current doctrine (Lane, 2002). Finally, after the apprehension of the Washington-area serial snipers, one of whom, Lee Malvo, was 17 years old, prosecutors vied for the right to try the case in their jurisdiction. It was widely speculated that Attorney General Ashcroft selected Virginia as the venue, in large part, because that jurisdiction permits the execution of juveniles, whereas Maryland, where the majority of the killings took place, does not (Lichtblau, 2002). Thus, this highly publicized case has focused national attention on the debate over the juvenile death penalty.

The juvenile death penalty is a critically important issue in juvenile crime policy, but it is not our sole focus in this article. We are interested in the broader question of whether juveniles should be punished to the same extent as adults who have committed comparable crimes. Capital punishment is the extreme case, but in practical effect, it is not the most important one in an era in which youth crime policy has become increasingly punitive. The question of whether juveniles should be punished like adults is important to discussions about sentencing guidelines, the transfer of juvenile offenders into the adult criminal justice system, and the incarceration of juveniles in adult facilities (Fagan & Zimring, 2000). High-profile murder cases, like those involving Lee Malvo or Lionel Tate, the Florida 14-year-old who was sentenced to life in prison for killing a playmate during a wrestling match, generate public attention to these matters (e.g., Browning, 2001), but questions about the appropriate punishment of juvenile offenders arise in many less visible cases, including those involving nonviolent crimes such as drug selling (Clary, 2001).

In this article, we draw on research and theory about adolescent development to examine questions about the criminal culpability of juveniles. Recent shifts in juvenile justice policy and practice toward the harsher treatment of youthful offenders are grounded in concerns about public protection and the belief that there is no good reason to exercise leniency with young offenders. This view rejects

Laurence Steinberg, Department of Psychology, Temple University; Elizabeth S. Scott, University of Virginia School of Law.

Work on this article was supported by the John D. and Catherine T. MacArthur Foundation Research Network on Adolescent Development and Juvenile Justice, of which the authors are members.

Correspondence concerning this article should be addressed to Laurence Steinberg, Department of Psychology, Temple University, Philadelphia, PA 19122. E-mail: lds@temple.edu



Copyright 2003 by the American Psychological Association, Inc. 0003-066X/03/$12.00
Vol. 58, No. 12, 1009–1018 DOI: 10.1037/0003-066X.58.12.1009



Laurence Steinberg

the conventional wisdom behind traditional juvenile justice policy and challenges those who support reduced punishment for juveniles to justify a separate, more lenient justice regime for young offenders. We accept this challenge, and we argue that emerging knowledge about cognitive, psychosocial, and neurobiological development in adolescence supports the conclusion that juveniles should not be held to the same standards of criminal responsibility as adults. Under standard, well-accepted principles of criminal law, the developmental immaturity of juveniles mitigates their criminal culpability and, accordingly, should moderate the severity of their punishment.

## Excuse and Mitigation in the Criminal Law

The starting point for our argument is the core principle of penal proportionality—the foundation of any legitimate system of state punishment (Bonnie, Coughlin, & Jeffries, 1997). Proportionality holds that fair criminal punishment is measured not only by the amount of harm caused or threatened by the actor but also by his or her blameworthiness. Thus, the question we address is whether, and in what ways, the immaturity of adolescent offenders is relevant to their blameworthiness and, in turn, to appropriate punishment for their criminal acts. Answering this question requires a careful examination of the developmental capacities and processes that are relevant to adolescent criminal choices, as well as the conditions and circumstances that reduce culpability in the criminal law (Scott & Steinberg, 2003).

As a preliminary matter, it is important to distinguish between excuse and mitigation, two constructs that are distinct within the law but that are often blurred in laypersons' discussions of crime and punishment (Hart, 1968). In legal parlance, *excuse* refers to the complete exculpation of a criminal defendant; he or she bears no responsibility for the crime and should receive no punishment. Not surprisingly, defenses that excuse actors altogether from criminal liability are very narrowly drawn. For example, crimes committed under extreme duress may be excused—one who acts with a gun to one's head, for instance—whereas crimes committed under less stressful conditions would not (Robinson, 1997; Wasik, 1977). Unlike excuse, which calls for a binary judgment—guilty or not guilty—*mitigation* places the culpability of a guilty actor somewhere on a continuum of criminal culpability and, by extension, a continuum of punishment. Thus, mitigation is a consideration when a harmful act is sufficiently blameworthy to meet the minimum threshold of criminal responsibility, but the actor's capacities are sufficiently compromised, or the circumstances of the crime sufficiently coercive, to warrant *less* punishment than the typical offender would receive. For example, mental illness that distorts an individual's decision making, but that is not severe enough to support an insanity defense, can reduce the grade of an offense or result in a less punitive disposition (Bonnie et al., 1997).

The public debate about the criminal punishment of juveniles is often heated and ill-informed, in part because the focus is typically on excuse when it should be on mitigation. It is often assumed, in other words, that the only alternative to adult punishment of juveniles is no punishment at all—or a slap on the hand. Instead, we argue that the developmental immaturity of adolescence mitigates culpability and justifies more lenient punishment, but that it is not, generally, a basis for excuse—except in the case of *very* young, preadolescent offenders. That is, a juvenile offender, owing to his or her developmental immaturity, should be viewed as *less* culpable than a comparable adult offender, but not as an actor who is without any responsibility for the crime. The public understandably wants to make sure that juvenile offenders are held responsible for their crimes, so that other would-be offenders receive a strong message about the costs of crime, and so that the community is protected from those who might offend again (Bennett, DiIulio, & Walters, 1996). A policy based on mitigation can achieve these goals; at the same time, however, such a policy recognizes that youths are less culpable than adults and punishes them less harshly.

Criminal law doctrine takes account of excuse and mitigation in many ways in calculating the seriousness of offenses and the amount of punishment that is appropriate. For example, defenses such as duress, insanity, and self-defense recognize that actors can cause the harm of the offense but be less culpable than the typical offender—or, in extreme cases, not culpable at all (Robinson, 1997). Also, under the law of homicide, punishment for causing the death of another varies dramatically depending on the blameworthiness of the actor (Michael & Wechsler, 1937). The actor who kills intentionally is deemed less culpable when he or she does so without premeditation and deliberation. One who kills in response to provocation or under extreme emotional disturbance is guilty only of manslaughter, not murder. And a person who causes a victim's death



**Elizabeth S. Scott**

through negligence is punished less severely than one who actually intends to kill (Bonnie et al., 1997). Finally, mitigation plays a key role in sentencing. In most states, sentencing guidelines include a list of mitigating factors to be considered in the determination of the amount of punishment the convicted offender should receive. These mitigating factors include traits of the offender and circumstances surrounding the offense that may reduce culpability (Florida Annotated Statutes, 2001).

In general, factors that reduce criminal culpability can be grouped roughly into three categories. The first category includes endogenous impairments or deficiencies in the actor's decision-making capacity that affect his or her choice to engage in criminal activity. The incapacity—or diminished capacity—may be due to mental illness or mental retardation, extreme emotional distress, or susceptibility to influence or domination (Kadish, 1987).

Under the second category, culpability is reduced when the external circumstances faced by the actor are so compelling that an ordinary (or "reasonable") person might have succumbed to the pressure in the same way as did the defendant (Morse, 1994). The extraordinary circumstances could involve duress, provocation, threatened injury, or extreme need. A person who commits a crime in response to these circumstances typically receives less punishment than one who commits a comparable crime under less compelling conditions.

The third category of mitigation includes evidence that the criminal act was out of character for the actor and that, unlike the typical criminal act, his or her crime was not the product of bad character. For example, a reduced sentence might result if the crime was a first offense; if the actor expressed genuine remorse or tried to mitigate the harm; if the actor had a history of steady employment, fulfillment of family obligations, and good citizenship; or, more generally, if the criminal act was aberrant in light of the defendant's established character traits and respect for the law's values (United States Sentencing Commission, 1998).

## Developmental Immaturity and Mitigation

Each of the categories of mitigation described in the previous section is important to an assessment of the culpability of adolescents who become involved in crime, and each sheds light on differences between normative adolescents and adults. First, and most obviously, adolescents' levels of cognitive and psychosocial development are likely to shape their choices, including their criminal choices, in ways that distinguish them from adults and that may undermine competent decision making. Second, because adolescents' decision-making capacities are immature and their autonomy constrained, they are more vulnerable than are adults to the influence of coercive circumstances that mitigate culpability for all persons, such as provocation, duress, or threat. Finally, because adolescents are still in the process of forming their personal identity, their criminal behavior is less likely than that of an adult to reflect bad character. Thus, for each of the sources of mitigation in criminal law, typical adolescents are less culpable than are adults because adolescent criminal conduct is driven by transitory influences that are constitutive of this developmental stage.

### *Deficiencies in Decision-Making Capacity*

It is well established that reasoning capabilities increase through childhood into adolescence and that preadolescents and younger teens differ substantially from adults in their cognitive abilities (Keating, 1990). These basic improvements in reasoning are complemented by increases in specific and general knowledge gained through education and experience and by improvements in basic information-processing skills, including attention, short- and long-term memory, and organization (Siegler, 1997)

Although few psychologists would challenge the assertion that most adults have better reasoning skills than preadolescent children, it is often asserted that, by mid-adolescence, teens' capacities for understanding and reasoning in making decisions roughly approximate those of adults (Fischhoff, 1992; Furby & Beyth-Marom, 1992). Indeed, advocates for adolescent self-determination made this argument in support of adolescent abortion rights (American Psychological Association, 1990; Melton, 1983). However, as we and our colleagues have argued in several recent articles, there is good reason to question whether age differences in decision making disappear by mid-adolescence, particularly as capacities may be manifested in the real-world settings in which choices about criminal activity are made (Scott, Reppucci, & Woolard, 1995; Steinberg & Cauffman, 1996). Laboratory studies that are the basis of the assertion that adolescents' reasoning ability is equivalent to that of adults are only modestly

useful in understanding how youths compare with adults in making choices that have salience to their lives or that are presented in stressful, unstructured settings in which decision makers must rely on personal experience, knowledge, and intuition (Cauffman & Steinberg, 2000; Scott et al., 1995; Steinberg, 2003; Steinberg & Cauffman, 1996). In typical laboratory studies of decision making, individual adolescents are presented with hypothetical dilemmas under conditions of low emotional arousal and then asked to make and explain their decisions. In the real world, and especially in situations in which crimes are committed, however, adolescents' decisions are not hypothetical, they are generally made under conditions of emotional arousal (whether negative or positive), and they usually are made in groups. In our view, it is an open and unstudied question whether, under real-world conditions, the decision making of mid-adolescents is truly comparable with that of adults.

More important, even when teenagers' cognitive capacities come close to those of adults, adolescent judgment and their actual decisions may differ from that of adults as a result of psychosocial immaturity. Among the psychosocial factors that are most relevant to understanding differences in judgment and decision making are (a) susceptibility to peer influence, (b) attitudes toward and perception of risk, (c) future orientation, and (d) the capacity for self-management. Whereas cognitive capacities shape the *process* of decision making, psychosocial immaturity can affect decision-making *outcomes*, because these psychosocial factors influence adolescent values and preferences in ways that drive the cost–benefit calculus in the making of choices. In other words, to the extent that adolescents are less psychosocially mature than adults, they are likely to be deficient in their decision-making capacity, even if their cognitive processes are mature (Cauffman & Steinberg, 2000; Scott et al., 1995; Steinberg & Cauffman, 1996).

There is considerable evidence that the four dimensions of psychosocial maturity described in the previous paragraph continue to develop during the adolescent years. First, substantial research supports the conventional wisdom that, even in middle adolescence, teenagers are more responsive to peer influence than are adults. Studies in which adolescents are presented with hypothetical dilemmas in which they are asked to choose between an antisocial course of action suggested by their peers and a prosocial one of their own choosing indicate that susceptibility to peer influence increases between childhood and early adolescence as adolescents begin to individuate from parental control, peaks around age 14, and declines slowly during the high school years (Berndt, 1979; Steinberg & Silverberg, 1986). Peer influence affects adolescent judgment both directly and indirectly. In some contexts, adolescents make choices in response to direct peer pressure to act in certain ways. More indirectly, adolescents' desire for peer approval—and fear of rejection—affect their choices, even without direct coercion. Peers also provide models for behavior that adolescents believe will assist them in accomplishing their own ends (Moffitt, 1993).

Second, it is well established that over an extended period between childhood and young adulthood, individuals become more future-oriented. Studies in which individuals are asked to envision themselves or their circumstances in the future find that adults project out their visions over a significantly longer time frame than do adolescents (Greene, 1986; Nurmi, 1991). In addition, in studies in which individuals are queried about their perceptions of the short-term and longer term pros and cons of various sorts of risk taking (e.g., the risk of having unprotected sex, Gardner & Herman, 1990) or asked to give advice to others about risky decisions (e.g., whether to have cosmetic surgery; Halpern-Felsher & Cauffman, 2001), adolescents tend to discount the future more than adults do and to weigh more heavily short-term consequences of decisions—both risks and benefits—in making choices. There are at least two plausible explanations for this age difference in future orientation. First, owing to cognitive limitations in their ability to think in hypothetical terms, adolescents simply may be less able than adults to think about events that have not yet occurred (i.e., events that may occur sometime in the future). Second, the weaker future orientation of adolescents may reflect their more limited life experience. For adolescents, a consequence 5 years in the future may seem very remote in relation to how long they have been alive; teens may simply attach more weight to short-term consequences because they seem more salient to their lives (Gardner, 1993).

Third, adolescents differ from adults in their assessment of and attitude toward risk. In general, adolescents use a risk–reward calculus that places relatively less weight on risk, in relation to reward, than that used by adults. When asked to advise peers on making a potentially risky decision, for example (e.g., whether to participate in a study of an experimental drug), adults spontaneously mentioned more potential risks than did adolescents (Halpern-Felsher & Cauffman, 2001). In addition, experimental studies that use gambling tasks show that, compared with those of adults, adolescents' decisions are more driven by rewards and less by risks (see Furby & Beyth-Marom, 1992).

A number of explanations for this age difference have been offered. First, youths' relatively weaker risk aversion may be related to their more limited time perspective, because taking risks is less costly for those with a smaller stake in the future (Gardner & Herman, 1990). Second, adolescents may have different values and goals than do adults, leading them to calculate risks and rewards differently (Furby & Beyth-Marom, 1992). For example, the danger of some types of risk taking (e.g., driving well over the speed limit) could constitute reward for an adolescent but a cost to an adult. In addition, considerable evidence indicates that people generally make riskier decisions in groups than they do alone (Vinokur, 1971); there is evidence both that adolescents spend more time in groups than do adults and, as noted earlier, that adolescents are relatively more susceptible to the influence of others.

Fourth, although more research is needed, the widely held stereotype that adolescents are more impulsive than adults finds some support in research on developmental changes in impulsivity and self-reliance over the course of adolescence. As assessed on standardized self-report per-

sonality measures, impulsivity increases between middle adolescence and early adulthood and declines thereafter, and gains in self-management skills take place during early, middle, and late adolescence (Greenberger, 1982; Steinberg & Cauffman, 1996). Studies using the Experience Sampling Method, in which individuals are paged several times each day and asked to report on their emotions and activities, indicate that adolescents have more rapid and more extreme mood swings (both positive and negative) than adults, which may lead them to act more impulsively (Larson, Csikszentmihalyi, & Graef, 1980). Taken together, these findings indicate that adolescents may have more difficulty regulating their moods, impulses, and behaviors than do adults.

Most of the developmental research on cognitive and psychosocial functioning in adolescence measures behaviors, self-perceptions, or attitudes, but mounting evidence suggests that at least some of the differences between adults and adolescents have neuropsychological and neurobiological underpinnings. What is most interesting is that studies of brain development during adolescence, and of differences in patterns of brain activation between adolescents and adults, indicate that the most important developments during adolescence occur in regions that are implicated in processes of long-term planning, the regulation of emotion, impulse control, and the evaluation of risk and reward (Spear, 2000). For example, changes in the limbic system around puberty may stimulate adolescents to seek higher levels of novelty and to take more risks and may contribute to increased emotionality and vulnerability to stress (Dahl, 2001). At the same time, patterns of development in the prefrontal cortex, which is active during the performance of complicated tasks involving long-term planning and judgment and decision making, suggest that these higher order cognitive capacities may be immature well into late adolescence (Geidd et al., 1999; Sowell, Thompson, Holmes, Jernigan, & Toga, 1999).

At this point, the connection between neurobiological and psychological evidence of age differences in decision-making capacity is indirect and suggestive. However, the results of studies using paper-and-pencil measures of future orientation, impulsivity, and susceptibility to peer pressure point in the same direction as the neurobiological evidence, namely, that brain systems implicated in planning, judgment, impulse control, and decision making continue to mature into late adolescence. Thus, there is good reason to believe that adolescents, as compared with adults, are more susceptible to influence, less future oriented, less risk averse, and less able to manage their impulses and behavior, and that these differences likely have a neurobiological basis. The important conclusion for our purposes is that juveniles may have diminished decision-making capacity compared with adults because of differences in psychosocial capacities that are likely biological in origin.

It is easy to see how psychosocial immaturity can contribute to youthful choices to get involved in crime. Consider the following scenario (adapted from Scott & Grisso, 1997). An adolescent is hanging out with his friends, when one member of the peer group, on spur of the moment, suggests that they rob a passer-by to get money to buy beer. The adolescent does not really go through a deliberative decision-making process but "chooses" to go along, despite having mixed feelings, because he assumes that his standing in the group will suffer if he declines to participate—a negative consequence to which he attaches considerable weight. Although a more mature person might think of options to extricate himself from the situation, the adolescent may not, because he lacks experience in similar circumstances, because the choice is made so quickly, or because he has difficulty projecting the course of events into the future. On top of this, the "adventure" of the hold-up and the possibility of getting some money from it are appealing. These immediate and concrete rewards, along with the reward of peer approval, weigh more heavily in his decision than the abstract and temporally remote possibility of apprehension by the police. The last thing the adolescent considers is the long-term costs associated with conviction of a serious crime.

The available evidence supports the conclusion that, like offenders who are mentally retarded and mentally ill, adolescents are less culpable than typical adults because of diminished decision-making capacity. To some extent, jurists have acknowledged this. In *Thompson v. Oklahoma* (1998), for example, the Supreme Court pointed to the immature judgment of youth in prohibiting the execution of juveniles whose offenses occurred before their 16th birthday. Justice Stevens concluded that to impose the death penalty on youths below this age violates the principle of proportionality:

> Less culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult. The basis of this conclusion is too obvious to require extensive explanation. Inexperience, less intelligence and less education make a teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is more apt to be motivated by mere emotion or peer pressure than is an adult. The reasons that juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult. (*Thompson v. Oklahoma,* 1998, p. 835)

The Supreme Court decision in *Thompson* does not speak explicitly in the language of adolescent development or support its arguments with scientific research on adolescents' capacities. Nonetheless, the Court's pronouncement can best be understood as a recognition that psychosocial immaturity compromises adolescents' decision making in ways that mitigate criminal blameworthiness.

The Court's recent rejection in *Atkins v. Virginia* (2002) of imposing the death penalty on mentally retarded offenders points more explicitly to the mitigating character of attributes that characterize adolescent decision making as well as those of retarded persons:

> Because of their impairments, . . . [mentally retarded offenders] have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is . . . abundant

evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings, they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but diminish their personal culpability. (*Atkins v. Virginia,* 2002, p. 2250)

Many factors that influence youthful decision making and distinguish adolescents from typical adults are similar to those that compromise the criminal choices of actors who are mentally retarded. Moreover, like offenders who are mentally retarded, there is good reason to believe that the deficiencies of adolescent judgment are organic in nature—although, among adolescents, poor judgment is shaped by transitory developmental factors and, unlike mentally retarded persons, most adolescents will mature out of their tendency to make unwise choices that are driven by the psychosocial influences. Nonetheless, during adolescence, immature judgment is likely no more subject to the volitional control of the youth than is the poor judgment of adults who are mentally retarded.

### Heightened Vulnerability to Coercive Circumstances

The psychosocial immaturity of adolescents contributes to their diminished capacity (the first category of mitigation), but it is important to another source of mitigation as well. As we noted earlier, criminal culpability can be reduced on the basis of circumstances that impose extraordinary pressures on the actor. The criminal law does not require exceptional fortitude or bravery of citizens and, in general, recognizes mitigation where an ordinary (or in legal parlance, "reasonable") person might have responded in the same way as the defendant under similar circumstances. In evaluating the behavior of an adolescent in responding to extenuating circumstances, however, the correct basis for evaluation is not comparison of the actor's behavior with that of an "ordinary" adult but rather with that of an "ordinary" adolescent (*In re William G.*, 1987; Scott & Steinberg, 2003).

Because of their developmental immaturity, normative (i.e., "ordinary") adolescents may respond adversely to external pressures that adults are able to resist. If adolescents are more susceptible to *hypothetical* peer pressure than are adults (as noted earlier), it stands to reason that age differences in susceptibility to *real* peer pressure will be even more considerable. Thus, it seems reasonable to hypothesize that a youth would succumb more readily to peer influence than would an adult in the same situation. Similarly, if adolescents are more impulsive than adults, it may take less of a threat to provoke an aggressive response from a juvenile. And, because adolescents are less likely than adults to think through the future consequences of their actions, the same level of duress may have a more disruptive impact on juveniles' decision making than on that of adults. In general, legal judgments about mitigation should consider the extent to which developmentally normal adolescents are more susceptible to external pressures than are adults. Adolescents' claim to mitigation on this ground is particularly compelling in that, as legal minors, they lack the freedom that adults have to extricate themselves from a criminogenic setting (Fagan, 2000).

Although plausible inferences can be drawn about how developmental influences may affect adolescents' responses to external pressures, we do not have sufficient research comparing the behavior of adolescents and adults at varying levels of duress, provocation, or coercion. Some social psychological research has examined contextual influences on decision making—for example, the literature on the *risky shift*, which shows that individuals take more risks in groups than when alone (Vinokur, 1971)—but this research has not examined whether the impact of different contextual factors varies as a function of the decision maker's age. Further, as we noted earlier, studies comparing the decision making of adolescents with that of adults have intentionally minimized the influence of contextual factors that could affect the decision-making process differently for individuals of different ages. Recent evidence on age differences in the processing of emotionally arousing information supports the hypothesis that adolescents may tend to respond to threats more viscerally and emotionally than adults (Baird, Gruber, & Fein, 1999), but far more research on this topic is needed.

### Unformed Character as Mitigation

In addition to the mitigating effects of adolescents' diminished decision-making capacity and greater vulnerability to external pressures, youthful culpability is also mitigated by the relatively unformed nature of their characters. As we have noted, the criminal law implicitly assumes that harmful conduct reflects the actor's bad character and treats evidence that this assumption is inaccurate as mitigating of culpability (Duff, 1993; Vuoso, 1986). For most adolescents, the assumption *is* inaccurate, and thus their crimes are less culpable than those of typical criminals.

The emergence of personal identity is an important developmental task of adolescence and one in which the aspects of psychosocial development discussed earlier play a key role. As documented in many empirical tests of Erikson's (1968) theory of the adolescent *identity crisis*, the process of identity formation includes considerable exploration and experimentation over the course of adolescence (Steinberg, 2002a). Although the identity crisis may occur in middle adolescence, the resolution of this crisis, with the coherent integration of the various retained elements of identity into a developed *self*, does not occur until late adolescence or early adulthood (Waterman, 1982). Often this experimentation involves risky, illegal, or dangerous activities like alcohol use, drug use, unsafe sex, and antisocial behavior. For most teens, these behaviors are fleeting; they cease with maturity as individual identity becomes settled. Only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood (Farrington, 1986; Moffitt, 1993). Thus, making predictions about the development of relatively more permanent and enduring traits on the basis of patterns of risky behavior observed in adolescence is an uncertain business. At least until late adolescence, individuals' val-

ues, attitudes, beliefs, and plans are likely to be tentative and exploratory expressions rather than enduring representations of personhood. Thus, research on identity development in adolescence supports the view that much youth crime stems from normative experimentation with risky behavior and not from deep-seated moral deficiency reflective of "bad" character. One reason the typical delinquent youth does not grow up to be an adult criminal is that the developmentally linked values and preferences that drive his or her criminal choices as a teenager change in predictable ways as the youth matures.

The distinction between youthful criminal behavior that is attributable to characteristics that adolescents outgrow and conduct that is attributable to relatively more permanent elements of personality is captured in Moffitt's (1993) work on the developmental trajectories of antisocial behavior. In her view, adolescent offenders fall into one of two broad categories: adolescence-limited offenders, whose antisocial behavior begins and ends during adolescence, and a much smaller group of life-course-persistent offenders, whose antisocial behavior begins in childhood and continues through adolescence and into adulthood. According to Moffitt, the criminal activity of both groups during adolescence is similar, but the underlying causes of their behavior are very different. Life-course-persistent offenders show longstanding patterns of antisocial behavior that appear to be rooted, at least in part, in relatively stable psychological attributes that are present early in development and that are attributable to deficient socialization or neurobiological anomalies. Adolescence-limited offending, in contrast, is the product of forces that are inherent features of adolescence as a developmental period, including peer pressure, experimentation with risk, and demonstrations of bravado aimed at enhancing one's status in the social hierarchy of the peer group. By definition, the causes of adolescence-limited offending weaken as individuals mature into adulthood.

In view of what we know about identity development, it seems likely that the criminal conduct of most young wrongdoers is quite different from that of typical adult criminals. Most adults who engage in criminal conduct act on subjectively defined preferences and values, and their choices can fairly be charged to deficient moral character. This cannot be said of typical juvenile actors, whose behaviors are more likely to be shaped by developmental forces that are constitutive of adolescence. To be sure, some adolescents may be in the early stages of developing a criminal identity and reprehensible moral character traits, but most are not. Indeed, studies of criminal careers indicate that the vast majority of adolescents who engage in criminal or delinquent behavior desist from crime as they mature into adulthood (Farrington, 1986). Thus the criminal choices of typical young offenders differ from those of adults not only because the choice, *qua* choice, is deficient as the product of immature judgment, but also because the adolescent's criminal act does not express the actor's bad character.

The notion that individuals are less blameworthy when their crimes are out of character is significant in assessing the culpability of typical young offenders. In one sense, young wrongdoers are not like adults whose acts are less culpable on this ground. A claim that an adult's criminal act was out of character requires a demonstration that his or her established character is good. The criminal choice of the typical adolescent cannot be evaluated in this manner because the adolescent's personal identity is in flux and his or her character has not yet stabilized. However, like the adult offender whose crime is mitigated because it is out of character, adolescent offenders lack an important component of culpability—the connection between a bad act and a bad character.

The fact that antisocial activity in adolescence is not usually indicative of bad character also raises important questions about the construct validity of *juvenile psychopathy*, a "diagnosis" that has recently received considerable attention (Edens, Skeem, Cruise, & Cauffman, 2001; Forth & Burke, 1998; Seagrave & Grisso, 2002; Steinberg, 2002b). Labeling an individual as a *psychopath*—perhaps the quintessential case of "bad character"—implies that the individual's antisocial behavior is due to fixed aspects of his or her personality. But, as we have suggested, this assumption is difficult to defend as applied to individuals whose identity development is still under way. (Indeed, it is for this very reason that the diagnosis of antisocial personality disorder is not made prior to the age of 18; American Psychiatric Association, 1994). Although the notion that some juvenile offenders are actual or "fledgling" psychopaths has become increasingly popular in legal and psychological circles, no data exist on the stability or continuity of psychopathy between adolescence and adulthood. In the absence of evidence that juveniles who, on the surface, resemble adult psychopaths (e.g., juveniles who are callous, manipulative, and antisocial) actually become adult psychopaths, it would seem unwise to use this label when describing an adolescent.

Our analysis also clarifies why the crime of the adult actor with "adolescent" traits warrants a different response than does that of the typical young offender. Although most impulsive young risk takers who focus on immediate consequences will mature into adults with different values, some adult criminals have traits that are similar to their younger counterparts. In the case of the adult, however, the predispositions, values, and preferences that motivate him or her most likely are characterological and are unlikely to change predictably with the passage of time. Adolescent traits that contribute to criminal conduct are normative in adolescence, but they are not typical of adulthood. In an adult, these traits are often part of the personal identity of an individual who is not respectful of the values of the criminal law and who deserves full punishment when he or she violates its prohibitions.

## Developmental Immaturity, Diminished Culpability, and the Juvenile Crime Policy

The adolescent who commits a crime typically is not so deficient in his or her decision-making capacity that the

adolescent cannot understand the immediate harmful consequences of his or her choice or its wrongfulness, as might be true of a mentally disordered person or a child. Yet, in ways that we have described, the developmental factors that drive adolescent decision making may predictably contribute to choices reflective of immature judgment and unformed character. Thus, youthful criminal choices may share much in common with those of adults whose criminal behavior is treated as less blameworthy than that of the typical offender, because their criminal behavior is out of character, their decision-making capacities are impaired by emotional disturbance, mental illness, or retardation, or their criminal choices were influenced by unusually coercive circumstances.

If, in fact, adolescent offenders are generally less culpable than their adult counterparts, how should the legal system recognize their diminished responsibility? An important policy choice is whether immaturity should be considered on an individualized basis, as is typical of most mitigating conditions, or as the basis for treating young law violators as a separate category of offenders (Scott & Steinberg, 2003).

We believe that the uniqueness of immaturity as a mitigating condition argues for the adoption of, or renewed commitment to, a categorical approach, under which most youths are dealt with in a separate justice system, in which rehabilitation is a central aim, and none are eligible for the ultimate punishment of death. Other mitigators—emotional disturbance and coercive external circumstances, for example—affect criminal choices with endless variety and have idiosyncratic effects on behavior; thus, individualized consideration of mitigation is appropriate where these phenomena are involved. In contrast, the capacities and processes associated with adolescence are characteristic of individuals in a relatively defined group, whose development follows a roughly systematic course to maturity, and whose criminal choices are affected in predictable ways. Although individual variations exist within the age cohort of adolescence, of course, coherent boundaries can delineate a minimum age for adult adjudication, as well as a period of years beyond this when a strong presumption of reduced culpability operates to keep most youths in a separate system. The age boundary is justified if the presumption of immaturity can be applied confidently to most individuals in the group, as we believe is the case for juveniles. Moreover, a categorical approach to the separation of juveniles and adults offers substantial practical efficiencies over one in which immaturity must be assessed on a case-by-case basis.

A developmentally informed boundary restricting the dispositions that can be imposed on juveniles who have entered the criminal justice system represents a precommitment to taking into account the mitigating character of youth in assigning blame. Without such a commitment, immaturity often may be ignored when the exigencies of a particular case engender a punitive response, as in the case of the accused sniper Lee Malvo. Indeed, absent such a commitment, immaturity is likely to count as mitigating only when the juvenile otherwise presents a sympathetic case or when other, irrelevant factors, such as a childlike physical appearance, lead others to view the offender as relatively less blameworthy. This is a critical concern, given the evidence that racial and ethnic biases influence attitudes about the punishment of young offenders and that decision makers are more likely to discount the mitigating impact of immaturity when judging the behavior of minority youths (Bridges & Steen, 1998; Graham, 2002). A structural boundary that hinders adult adjudication of young offenders and that prohibits the use of the death penalty altogether for juveniles is justified as a counterweight to this pernicious influence.

Maintaining a categorical distinction between juvenile and adult offenders does not mean that all youths are less mature than adults in their decision-making capacity or that all juveniles are unformed in their identity development. Some individuals exhibit mature judgment at an early age (most are not offenders, however), and among others, antisocial tendencies that begin in childhood continue in a stable pattern of criminal conduct that defines their adult character. Adult punishment of psychologically mature youths might be fair if these individuals could be identified with some degree of certainty. But we currently lack the diagnostic tools to evaluate psychosocial immaturity reliably on an individualized basis or to distinguish young career criminals from ordinary adolescents who will repudiate their reckless experimentation as adults. As a consequence, litigating maturity on a case-by-case basis is likely to be an error-prone undertaking. This risk of error is problematic as a general matter, but it is unacceptable when the stakes are life and death. In our view, this risk of error argues against ever imposing the death penalty on young offenders.

A policy that treats immaturity as a mitigating condition is viable only to the extent that public protection is not seriously compromised, and public safety concerns dictate that the small group of young recidivists who inflict large amounts of social harm must be incapacitated as adults. That is not to say that we should "throw away the key" when we incapacitate these youths, however. Given the uncertainty of predicting adult character during adolescence, efforts should be made to protect against the iatrogenic effects of incarceration in prison and to invest in the future postincarceration lives of even serious chronic offenders (Scott & Grisso, 1997).

Ongoing research on the links between brain maturation and psychological development in adolescence has begun to shed light on why adolescents are not as planful, thoughtful, or self-controlled as adults, and, more importantly, it clarifies that these "deficiencies" may be physiological as well as psychological in nature. Nevertheless, we are a long way from comprehensive scientific understanding in this area, and research findings are unlikely to ever be sufficiently precise to draw a chronological age boundary between those who have adult decision-making capacity and those who do not. Some of the relevant abilities (e.g., logical reasoning) may reach adultlike levels in middle adolescence, whereas others (e.g., the ability to resist peer influence or think through the future consequences of

one's actions) may not become fully mature until young adulthood.

Many perspectives can inform debates about youth crime policy and the juvenile death penalty, but surely one should be the science of developmental psychology. Psychologists have much to contribute to discussions about the underpinnings, biological bases, and developmental course of the capacities and competencies relevant to criminal culpability and to the appropriateness of capital punishment for juveniles. Especially needed are studies that link developmental changes in decision making to changes in brain structure and function, and studies that examine age differences in decision making under more ecologically valid conditions.

In our view, however, there is sufficient indirect and suggestive evidence of age differences in capacities that are relevant to criminal blameworthiness to support the position that youths who commit crimes should be punished more leniently than their adult counterparts. Although, as we have noted, the definitive developmental research has not yet been conducted, until we have better and more conclusive data, it would be prudent to err on the side of caution, especially when life and death decisions are concerned. The Supreme Court has repeatedly emphasized that the death penalty is acceptable punishment only for the most blameworthy killers (*Gregg v. Georgia*, 1976; *Lockett v. Ohio*, 1978). All other developed countries have adopted a policy that assumes that adolescents, because of developmental immaturity, simply do not satisfy this criterion. The United States should join the majority of countries around the world in prohibiting the execution of individuals for crimes committed under the age of 18.

## REFERENCES


American Psychiatric Association. (1994). *Diagnostic and statistical manual of mental disorders* (4th ed.). Washington, DC: Author.

American Psychological Association. (1990). *Brief for Amicus Curiae in support of appellees, Hodgson v. Minnesota, 497 U.S. 417, No. 88-805.* Washington, DC: Author.

Atkins v. Virginia, 122 S. Ct. 2242 (2002).

Baird A., Gruber, S., & Fein, D. (1999). Functional magnetic resonance imaging of facial affect recognition in children and adolescents. *Journal of the American Academy of Child and Adolescent Psychiatry, 38,* 195–199.

Bennett, W., DiIulio, J., Jr., & Walters, W. (1996). *Body count.* New York: Simon & Shuster.

Berndt, T. (1979). Developmental changes in conformity to peers and parents. *Developmental Psychology, 15,* 608–616.

Bonnie, R., Coughlin, A., & Jeffries, J. (Eds.). (1997). *Criminal law.* New York: Foundation Press.

Bradley, C. A. (2002). The juvenile death penalty and international law. *Duke Law Journal, 52,* 485.

Bridges, G., & Steen, S. (1998). Racial disparities in official assessments of juvenile offenders: Attributional stereotypes as mediating mechanisms. *American Sociological Review, 63,* 554–570.

Browning, M. (2001, March 10). Boy, 14, gets life in TV wrestling death: Killing of 6-yr.-old playmate wasn't just horseplay, Florida judge says. *Chicago Sun-Times,* p. 1.

Cauffman, E., & Steinberg, L. (2000). (Im)maturity of judgment in adolescence: Why adolescents may be less culpable than adults. *Behavioral Sciences and the Law, 18,* 1–21.

Clary, M. (2001, March 20). Boy's life term puts focus on youth punishment. *Los Angeles Times,* p. 1A.

Dahl, R. (2001). Affect regulation, brain development, and behavioral/emotional health in adolescence. *CNS Spectrums, 6,* 1–12.

de la Vega, C. (2002). Amici Curaie urge the U.S. Supreme Court to consider international human rights law in juvenile death penalty case. *Santa Clara Law Review, 42,* 1041–1042.

Duff, R. (1993). Choice, character, and criminal liability. *Law and Philosophy, 12,* 345–383.

Edens, J., Skeem, J., Cruise, K., & Cauffman, E. (2001). The assessment of juvenile psychopathy and its association with violence: A critical review. *Behavioral Sciences and the Law, 19,* 53–80.

Erikson, E. (1968). *Identity: Youth and crisis.* New York: Norton.

Fagan, J. (2000). Contexts of choice by adolescents in criminal events. In T. Grisso & R. Schwartz (Eds.), *Youth on trial: A developmental perspective on juvenile justice* (pp. 371–401). Chicago: University of Chicago Press.

Fagan, J., & Zimring, F. (2000). *The changing borders of juvenile justice: Transfer of adolescents to the criminal court.* Chicago: University of Chicago Press.

Farrington, D. (1986). Age and crime. In M. Tonry & N. Morris (Eds.), *Crime and justice: An annual review of research* (pp. 189–217). Chicago: University of Chicago Press.

Fischhoff, B. (1992). Risk taking: A developmental perspective. In J. Yates (Ed.), *Risk-taking behavior* (pp. 133–162). New York: Wiley.

Florida Annotated Statutes. (2001). *Section 921.0026.* St. Paul, MN: West.

Forth, A., & Burke, H. (1998). Psychopathy in adolescence: Assessment, violence and developmental precursors. In D. Cooke, A. E. Forth, & R. D. Hare (Eds.), *Psychopathy: Theory, research and implications for society* (pp. 205–229). Boston: Kluwer Academic.

Furby, L., & Beyth-Marom, R. (1992). Risk taking in adolescence: A decision-making perspective. *Developmental Review, 12,* 1–44.

Gardner, W. (1993). A life-span rational choice theory of risk taking. In N. Bell & R. Bell (Eds.), *Adolescent risk taking* (pp. 66–83). Newbury Park, CA: Sage.

Gardner, W., & Herman, J. (1990). Adolescents' AIDS risk taking: A rational choice perspective. In W. Gardner, S. Millstein, & B. Wilcox (Eds.), *Adolescents in the AIDS epidemic* (pp. 17–34). San Francisco: Jossey-Bass.

Gregg v. Georgia, 428 U.S. 153 (1976).

Giedd, J., Blumenthal, J., Jeffries, N., Castllanos, F., Liu, H., Zijdenbos, A., et al. (1999). Brain development during childhood and adolescence: A longitudinal MRI study. *Nature Neuroscience, 2,* 861–863.

Graham, S. (2002, March). *Racial stereotypes in the juvenile justice system.* Paper presented at the biennial meeting of the American Psychology-Law Society, Austin, TX.

Greenberger, E. (1982). Education and the acquisition of psychosocial maturity. In D. McClelland (Ed.), *The development of social maturity* (pp. 155–189). New York: Irvington.

Greene, A. (1986). Future-time perspective in adolescence: The present of things future revisited. *Journal of Youth and Adolescence, 15,* 99–113.

Halpern-Felsher, B., & Cauffman, E. (2001). Costs and benefits of a decision: Decision-making competence in adolescents and adults. *Journal of Applied Developmental Psychology, 22,* 257–273.

Hart, H. L. A. (1968). *Punishment and responsibility: Essays in the philosophy of law.* New York: Oxford University Press.

In re William G. (1987) 963 Pacific Reporter 2d 187 (Ariz. App. Div.).

Kadish, S. (1987). Excusing crime. *California Law Review, 75,* 257–296.

Keating, D. (1990). Adolescent thinking. In S. S. Feldman & G. R. Elliot (Eds.), *At the threshold: The developing adolescent* (pp. 54–89). Cambridge, MA: Harvard University Press.

Lane, C. (2002, October 22). For justices, doubts on death penalty. *The Washington Post,* p. A03.

Larson, R., Csikszentmihalyi, M., & Graef, R. (1980). Mood variability and the psychosocial adjustment of adolescents. *Journal of Youth and Adolescence, 9,* 469–490.

Lichtblau, E. (2002, November 3). Feds may let Virginia try sniper case first. *The New York Times,* p. A1.

Lockett v. Ohio, 438 U.S. 586 (1978).

Melton, G. B. (1983). Toward "personhood" for adolescents: Autonomy and privacy as values in public policy. *American Psychologist, 39,* 99–103.

Michael, J., & Wechsler, H. (1937). A rationale of the law of homicide. *Columbia Law Review, 37,* 1267–1350.

Moffitt, T. (1993). Adolescence-limited and life-course-persistent antisocial behavior: A developmental taxonomy. *Psychological Review, 100,* 674–701.

Morse, S. (1994). Culpability and control. *Pennsylvania Law Review.* 142, 1587–1660.

Nurmi, J. (1991). How do adolescents see their future? A review of the development of future orientation and planning. *Developmental Review, 11,* 1–59.

Robinson, P. (1997). *Criminal law.* New York: Aspen

Scott, E., & Grisso, T. (1997). The evolution of adolescence: A developmental perspective on juvenile justice reform. *Journal of Criminal Law and Criminology, 88,* 137–189.

Scott, E., Reppucci, N., & Woolard, J. (1995). Evaluating adolescent decision making in legal contexts. *Law and Human Behavior, 19,* 221–244.

Scott, E., & Steinberg, L. (2003). Blaming youth. *Texas Law Review, 81,* 799–840.

Seagrave, D., & Grisso, T. (2002). Adolescent development and the measurement of juvenile psychopathy. *Law and Human Behavior, 26,* 219–239.

Siegler, R. (1997). *Children's thinking* (3rd ed.). Englewood Cliffs, NJ: Prentice Hall.

Sowell, E., Thompson, P., Holmes, C., Jernigan, T., & Toga, A. (1999). In vivo evidence for post-adolescent brain maturation in frontal and striatal regions. *Nature Neuroscience, 2,* 859–861.

Spear, P. (2000). The adolescent brain and age-related behavioral manifestations. *Neuroscience and Biobehavioral Reviews, 24,* 417–463.

Stanford v. Kentucky, 492 U.S. 361 (1989).

Steinberg, L. (2002a). *Adolescence* (6th ed.). New York: McGraw-Hill.

Steinberg, L. (2002b). The juvenile psychopath: Fads, fictions, and facts. *National Institute of Justice Perspectives on Crime and Justice: 2001 Lecture Series, 5,* 35–64.

Steinberg, L. (2003). Is decision-making the right framework for the study of adolescent risk-taking? In D. Romer (Ed.), *Reducing adolescent risk: Toward an integrated approach* (pp. 18–24). Thousand Oaks, CA: Sage.

Steinberg, L., & Cauffman, E. (1996). Maturity of judgment in adolescence: Psychosocial factors in adolescent decision-making. *Law and Human Behavior, 20,* 249–272.

Steinberg, L., & Silverberg, S. (1986). The vicissitudes of autonomy in early adolescence. *Child Development, 57,* 841–851.

Streib, V. (2002). *The juvenile death penalty today: Death sentences and executions for juvenile crimes, January 1, 1973–November 15, 2002* [Unpublished report]. Retrieved from http://www.law.onu.edu/faculty/streib/juvdeath.pdf

Thompson v. Oklahoma, 487 U.S. 815 (1998).

United States Sentencing Commission. (1998). *United States sentencing guidelines manual: Section 5K2.20.* Washington, DC: Author.

Vinokur, A. (1971). Review and theoretical analysis of the effects of group processes upon individual and group decisions involving risk. *Psychological Bulletin, 76,* 231–250.

Vuoso, G. (1986). Background, responsibility, and excuse. *Yale Law Review, 96,* 1661–1686.

Wasik, M. (1977). Duress and criminal responsibility. *Criminal Law Review,* 453–74.

Waterman, A. (1982). Identity development from adolescence to adulthood: An extension of theory and a review of research. *Developmental Psychology, 18,* 341–358.

**ORDER FORM**

Start my 2004 subscription to ***American Psychologist!***

ISSN: 0003-066X

___ $216.00, INDIVIDUAL NONMEMBER ________

___ $525.00, INSTITUTION ________

*In DC add 5.75% / In MD add 5% sales tax* ________

TOTAL AMOUNT ENCLOSED $ ________

**Subscription orders must be prepaid.** (Subscriptions are on a calendar year basis only.) Allow 4-6 weeks for delivery of the first issue. Call for international subscription rates.

**SEND THIS ORDER FORM TO:**
American Psychological Association
Subscriptions
750 First Street, NE
Washington, DC 20002-4242

Or call **(800) 374-2721**, fax **(202) 336-5568**.
TDD/TTY **(202) 336-6123**.
For subscription information, e-mail:
**subscriptions@apa.org**

AMERICAN PSYCHOLOGICAL ASSOCIATION

○ **Send me a FREE Sample Issue**

○ **Check enclosed** (make payable to **APA**)

**Charge my:** ○ VISA ○ MasterCard ○ American Express

Cardholder Name ________

Card No. ________ Exp. Date ________

________
Signature (Required for Charge)

**BILLING ADDRESS:** ________

________

City ________ State ________ Zip ________

Daytime Phone ________

E-mail ________

**SHIP TO:**

Name ________

Address ________

________

City ________ State ________ Zip ________

APA Member # ________ *AMPA14*

***APA dues include an annual subscription for this journal.***